IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

**ROBERT D. MCKENZIE,** and
**PATTIE MCKENZIE,**                                              Case No. 1:14-cv-01503-CL

Plaintiffs,

v.

                                                                                      **ORDER**

**UNITED STATES OF AMERICA,**
**BOISE CASCADE WOOD PRODUCTS LLC,**
**HM INC.,** and **EDWARD A. HANSCOM,**

Defendants,

_____

CLARKE, Magistrate Judge

Plaintiffs Robert and Pattie McKenzie bring this cause of action against the defendants,

the United States of America ("the government"), Boise Cascade Wood Products, LLC ("Boise

Cascade"), HM, Inc., and Edward Hanscom, owner of HM, Inc.   Plaintiffs' claims arise out of a

severe logging accident that took place on the Pilot Joe Timber Sale, located in the Applegate

Valley region in Jackson County, Oregon, wherein Robert McKenzie was critically injured.

Three motions for summary judgment have been filed, (#47, 49, 51), by all defendants.  The

parties have consented to magistrate jurisdiction. For the reasons below, all three motions are GRANTED.

## SUMMARY

This is a complicated case. First, it is a factually difficult case in the sense that the accident that led to Plaintiff's injury was gruesome and tragic and, without question, terrible. Timber fellers have a dangerous job. There are no "easy days," and the steep terrain and environmental pressures only added to the challenges on the Pilot Joe Sale. While these pressures were certainly faced by everyone working on the site, the timber cutters are the people whose lives are on the line, constantly. Second, certain factual disputes contribute to the complexity of the case. In the record before the Court, the statements of the other timber cutters, the loggers, the supervisors, and the contractual agreements between the various parties do not all perfectly match up with one another. As discussed below, however, the facts that are material to Plaintiffs' claims are not in dispute. Third, Plaintiffs' response to the motions for summary judgment raises claims under a number of different laws and regulatory schemes, apart from that which is alleged in the Complaint, and it is not clear whether all of these even apply to this case.

Regardless of the complicated facts and legal claims, however, at the heart of Plaintiffs' case are two fundamental questions: 1) Did Robert McKenzie have the discretion to cut down a hardwood that was a designated "reserve tree" or "leave tree" for safety purposes? 2) Did he have the discretion to decide not to cut a designated harvest tree if he did not feel that he could cut it down safely? The answer to both questions is "Yes." Plaintiffs have not raised a genuine dispute as to the fact that Robert McKenzie had the discretion to either cut the madrone hardwood that stood in his way, or to leave the harvest tree uncut. For this reason, and for the reasons below, the defendants' motions for summary judgment are granted.

## LEGAL STANDARD

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material of fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party has the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). The court cannot weigh the evidence or determine the truth but may only determine whether there is a genuine issue of fact. *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When a properly supported motion for summary judgment is made, the burden shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial. *Id.* at 250. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts which show there is a genuine issue for trial. *Devereaux*, 263 F.3d at 1076. In assessing whether a party has met its burden, the court views the evidence in the light most favorable to the non-moving party. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995).

## FACTUAL BACKGROUND

Defendants Boise Cascade and the Bureau of Land Management ("BLM")[1] entered into a contractual arrangement on October 18, 2011, which allowed Boise Cascade to purchase timber within the scope of the sale. Boise Mtn (#49) at 5. This arrangement resulted in the Pilot Joe

---

[1] The United States of America has properly been substituted for the BLM as a defendant in this case, but for clarity of the record, the Court will continue to refer to the BLM as the actor in this Opinion.

Sale, a commercial timber sale covering 245 acres of public land managed by the BLM. USA

Mtn (#51) at 7, 12. The Pilot Joe Sale called for the harvest of certain types of trees to allow for

the preservation of some of the old-growth hardwood trees at the site. Boise Mtn (#49) at 5. The

sale called for harvesting conifer trees measuring seven inches or greater in diameter at breast

height; conifers less than seven inches were reserved from the sale, as were all hardwood trees

and certain old growth trees. USA Mtn (#51) at 12. The sale was what is known as a "thinning"

operation, or a partial cut, as opposed to a clear cut. Under the terms of the Contract, Boise

Cascade purchased all timber within the contracted area, except for the trees that BLM "reserved

from cutting and removal" and were retained as property of the government. As discussed above,

among other "reserve" trees were all hardwood trees, many of which were madrones.

Additionally, under the terms of the Contract, Boise Cascade agreed to "be responsible

for all damages to any persons or property that arise out of any operations under this contract and

result from any breach of contract or wrongful or negligent act or omission of [Boise Cascade],

its contractors, subcontractors, or employees of any of them. Special Provisions M-5.

Boise Cascade, having agreed to purchase the Pilot Joe timber, contracted with defendant

HM, Inc., (owned by defendant Edward Hanscom), to log the timber. Southern Oregon

Contract; Wienke Aff. ¶ 6. A crew of about eight HM, Inc. employees conducted the yarding

operations. HM, Inc. contracted with Rodgers Contract Cutting, Inc., to provide timber cutters to

cut down the trees contemplated by the sale. Rodgers Contract Cutting retained Plaintiff Robert

McKenzie[2] to be one of several timber cutters to do the work. Several other timber cutters were

hired by Rodgers, including Gary Burg, Dan Ferrin, Robert Freeman, and Richie Holzhauser.

---

[2] It is unclear based on the record before the Court whether Plaintiff Robert McKenzie was an employee
of Rodger's Cutting or merely an independent contractor. However, Rodger's Cutting did provide
workmen's compensation coverage for Plaintiff, which is an exclusive remedy under ORS 658.018,
exempting Rodger's from all other liability, including the current litigation.

There is some dispute in the record regarding what the timber cutters were told in regards to the "reserve" hardwoods, or "leave trees." Plaintiff's recollection is that it was made very clear to everyone that this was a "sensitive" project, and that "there would be a lot of eyes watching this – this particular project from the environmental community." Plaintiff perceived that there was pressure on the timber cutters not to cut the hardwoods and the designated reserve trees: "The overall feeling and spirit, so to speak, of what was going on on the Pilot Joe was that they were very important trees and that I shouldn't be cutting – shouldn't be cutting them.'" Plaintiff remembers this being told to him at an initial meeting prior to the start of the season.

Defendant Hanscom, owner of HM, Inc., contends that the initial meeting was a "safety meeting," and he claims that he distributed a one page sheet to the timber cutters that summarized important information about the project including that "hardwood can be cut for safety reasons," that "conifers can be cut for safety reasons," that "if in doubt – leave designated cut trees stand," and above all, "safety first." The sheet also provided information about the location of the cutting units and the marking scheme that indicated which trees to cut and which trees to leave standing. Plaintiff could not recall whether or not there was any discussion about cutting down reserve trees for safety reasons during that meeting.

Dan Ferrin, one of the other timber fellers for the Rodgers crew also could not specifically recall the initial meeting with Hanscom, but he did testify that the information sheet with safety information was what Hanscom usually provides before his jobs, and that the information on the sheet matched his understanding of what the policies were on the Pilot Joe sale. He testified that if he cannot cut a tree safely, he leaves it or cuts another reserve tree to make it safe to cut the harvest tree. He understood that on Pilot Joe they could cut hardwoods for safety reasons.

Robert Freeman, another timber feller on the Rodgers crew testified that he asked Hanscom one day, "So, we're really supposed to save the hardwoods?" And he said, "You do what you've got to do" and "F'em, we're logging." Freeman testified that he never reported the hardwoods he cut down, and that no one told him it was a sensitive project. He also said that it would not have mattered if the environmentalists said it was a sensitive project, he would have cut it anyways. Freeman, along with another cutter, Richard Holzhauser, did recall seeing Hanscom's information sheet, and he was told by Hanscom that they could cut a reserve tree for safety, or leave a harvest tree for safety, which was consistent with their past experience. They both had occasion to cut reserve trees on Pilot Joe, and no one ever complained.

Gary Burg, another of Rodgers' cutters, was not at the initial meeting, but testified that he received a copy of Hanscom's information sheet from Rodgers Cutting, and it was consistent with what Rodgers told the cutters at monthly safety meetings – "cut what we need to." He also said that Hanscom told him directly to "just be careful and take whatever you need to, Gary, and if you have to, just leave it." Burg testified that several times on Pilot Joe, he cut down reserve trees so he could safely fall a harvest tree. No one ever told him he had done anything wrong for doing so.

Plaintiff Robert McKenzie is a seasoned timber cutter with nearly thirty years of experience. His injury happened in Unit 26-2 of the Pilot Joe Sale, on September 27, 2012. At approximately 10:30am Plaintiff came upon a harvest tree that he estimated to be 20-14 inches in diameter, and 125 feet tall. He noticed that there were two large trees approximately 40-50 feet up the hill on the left side of the corridor that were marked with yellow paint as "leave trees." The limbs on these trees – Douglas fir – extended into the yarding corridor and into the path for which he planned to fall the harvest tree. Further up the hill and to the right of the corridor was a

large forked madrone hardwood tree that was also a "leave tree." One arm of the madrone

extended out into the corridor and into the path of the tree he was preparing to harvest. Plaintiff

aimed the harvest tree to the furthest point to the left side of the madrone limb, intending that the

madrone branches would break away when the harvest tree landed on it. Once he saw that the

tree was falling, Plaintiff exited out his predetermined escape route. However, instead of

breaking through the branches of the madrone, the harvest tree began to slide down the slope of

the fork of the madrone toward its center. As the top of the harvest tree moved to the right, down

the fork, the butt of the harvest tree swept sideways off the stump and began to slide down the

hill. Because of the way the bottom of the cut tree slipped out from underneath the top, Plaintiff

did not have a chance to complete his escape route, and the tree slid into him, rolling on top of

him, and taking him partially down the hill. The tree crushed the lower half of his body, causing

severe injuries to his abdomen and pelvic regions, many of which are on-going and potentially

permanent.

## DISCUSSION

Plaintiff Robert McKenzie brings claims against the defendants for common law

negligence, as well as violation of Oregon's Employer Liability Law; his wife, Plaintiff Pattie

McKenzie, brings a claim for loss of consortium.

## I.     Defendants are entitled to summary judgment on Plaintiffs' claim under Oregon's Employer Liability Law.

Oregon's Employer Liability Law ("ELL") is a statute that imposes a higher standard of

care on employers who are engaged in dangerous lines of work:

> Generally, all owners, contractors or subcontractors and other
> persons having charge of, or responsibility for, any work involving
> a risk or danger to the employees or the public shall use every
> device, care and precaution that is practicable to use for the
> protection and safety of life and limb, limited only by the necessity

> for preserving the efficiency of the structure, machine or other
> apparatus or device, and without regard to the additional cost of
> suitable material or safety appliance and devices.

ORS 654.305. As discussed below, while Plaintiffs have raised a question of fact as to whether

this higher standard can be imposed on the defendants, they have not raised a sufficient question

of fact regarding whether or not the standard was met in this case.

## a. Plaintiffs have raised sufficient questions of fact regarding whether the defendants are indirect employers under the ELL.

The Oregon Supreme Court has held that, in addition to a worker's direct employer,

liability under the ELL can be imposed on an indirect employer "who (1) is engaged with the

plaintiff's direct employer in a 'common enterprise'; (2) retains the right to control the manner or

method in which the risk-producing activity was performed; or (3) actually controls the manner

or method in which the risk-producing activity is performed." *Yeatts Whitman v. Polygon Nw.*

*Co.*, 360 Or. 170 (2016) (citing *Woodbury v. CH2M Hill, Inc.*, 335 Or. 154, 160, 61 P.3d 918

(2003)).    In this case, the dangerous or "risk-producing" activity can be identified as the felling

of a harvest tree, on steep terrain, while attempting to preserve the reserve hardwoods in the area.

Here, Plaintiff alleges that the defendants BLM, Boise Cascade, HM, and Hanscom can

all be held liable under all three categories of indirect employment.    The Court agrees that

Plaintiffs have raised an issue of fact as to whether or not each of the defendants fall into at least

one of the above categories.

### 1. Plaintiffs have raised a question of fact as to whether the BLM retained the right to control which trees were harvested and which were reserved under the Contract's prescriptions.

To establish that defendants "retained the right to control" the pertinent risk-producing

activity, plaintiff must "identify some source of legal authority for that perceived right" or

present evidence from which a retained right of control can be inferred. *Boothby v. D.R. Johnson*

*Lumber Co.*, 341 Or. 35, 41, 137 P.3d 699 (2006). In *Boothby*, and more recently in *Yeatts,* the

Oregon Supreme Court focused its analysis of that issue on the terms of the contract between the

defendant and its independent contractor. *Id.; Yeatts*, 360 Or. 170 (2016).

In *Yeatts*, Polygon was the general contractor for a residential townhome development

project. On behalf of the developer, Polygon signed a contract with plaintiff's employer, Wood

Mechanix, to perform framing work on the project. The contract made Wood Mechanix

primarily responsible for safety measures for the framing work and required it to protect the

general contractor Polygon from liability for injuries that might befall Wood Mechanix

employees doing that work. *Yeatts*, 360 Or. 170 (2016).

However, the contract also included provisions under which Polygon retained some right

to control the framing work, including related safety matters. In particular, the contract provided:

> [Wood Mechanix] shall take all necessary safety precautions
> pertaining to its work and the conduct thereof, including but not
> limited to, compliance with all applicable laws, ordinances, rules[,]
> regulations and orders issued by a public authority, whether
> federal, state, local or other, the federal Occupational Safety and
> Health Act, the Oregon Safe Employment Act, and any safety
> measures requested by [Polygon].

*Id.* (emphasis in original). The Court determined that provision "permitted Polygon to require

safety measures that it deemed appropriate beyond those necessary to comply with applicable

state and federal laws; it correspondingly conferred discretion on Polygon to determine for itself

whether any additional safety measures should be taken." In addition, Polygon's Accident

Prevention Plan provided that Polygon's superintendents would inspect the construction site daily

for safety hazards and issue safety hazard notices to any subcontractor in violation. The Court

found that, even though that plan was never disseminated to Wood Mechanix, it reinforced the

point that "Polygon retained the right to inspect and ensure the integrity of the guardrails as

adequate fall protection measures, if it chose to do so." *Id.* Similarly, in this case, the defendants

retained the right to control the method and means of the timber cutting on the Pilot Joe Sale.

First, the BLM retained the right to control which trees were harvested and which were

reserved. Under the BLM / Boise Cascade Contract "Special Provision 40," the Government

specified certain timber that was to be reserved from cutting:

> Sec. 40. TIMBER RESERVED FROM CUTTING – The following timber
> on the contract area is hereby reserved from cutting and removal under the
> terms of this contract and is retained as the property of Government.
> (A) AR-1 All timber on the Reserve Area(s) as shown on Exhibit A and all
> orange painted trees which are on or mark the boundaries of the Reserve
> Area(s).
> (B) IR-1 Approximately Six Thousand One (6001) trees marked with Yellow
> Paint above and below stump height in all units as shown on Exhibit A.
> (C) IR-6 All conifers less than 7 inches DBH and all hardwood trees in all
> units as shown on Exhibit A.
> (D) IR-6 All snags except when determined to be a hazard during operations
> by the Authorized Officer, in all units as shown on Exhibit A.
> (E) IR-10M Genetically superior trees marked with Orange Paint and seed
> trees tags in the contract area. These trees are selected, genetically
> superior trees, and are specially valued as a component of the tree
> improvement program. Any damage to such reserve trees caused by
> Purchaser shall be charged for on the basis of the resulting total loss to the
> Government, including any loss in value as a superior seen source.

BLM/Boise Contract § 40.

The BLM has submitted evidence to show that the policy actually practiced on-site at the

Pilot Joe Sale allowed timber fellers to cut reserve trees, including hardwoods, if it was

necessary for safety purposes. For instance, Kenneth Wienke testified in his deposition that

"timber fellers had the ability to cut down madrones and hardwoods, if it was required for safety

reasons, in order to get the included timber down to the ground safely." Wienke Depo 47:11-14.

Wienke testified that the BLM/Boise contract gave fellers this authority to make such a decision,

but neither Wienke nor the BLM has pointed to any explicit provision in the contract allowing

for such discretion. *See* U.S.A. Mtn. 12.

The Government does point to the Contract's L-25 provision, which excludes from

reservation any trees that the BLM has approved for felling for safety or operational reasons.

*See* U.S.A.. Reply Br. 23, n.3. However, the fact that the BLM would need to authorize or mark

such trees to be felled illustrates the BLM's retention of the right to control which trees are

reserved and which are harvested, even for safety reasons. Indeed, the Government admits that

the Contract "required Boise to obtain authorization from BLM prior to [felling reserve trees for

safety reasons]." U.S.A. Reply Br. 23. Thus, even if BLM did not exercise actual control over

the process, it did retain the right to do so under the contract. Because there is no explicit

provision in the Contract that delegated the final decision-making authority to anyone other than

the BLM, Plaintiffs have raised a question of fact as to whether the BLM "retained the right to

control" the dangerous activity.

## 2. Plaintiffs have raised a question of fact as to whether Boise Cascade and HM, Inc. were engaged in a common enterprise with each other and with Plaintiff Robert McKenzie's employer.

In *Wilson*, the Oregon Supreme Court stated that an indirect employer may be held liable

under the common enterprise category

> where [the] defendant and [the] plaintiff's employers are
> simultaneously engaged in carrying out work on a common
> enterprise. When, as the result of the activities of [the] defendant's
> employees or use of his equipment, a risk of danger is created
> which contributes to an injury to [the] plaintiff who is the
> employee of another engaged in work on the same project, [the]
> defendant has been considered to have sufficient control over the
> work to be subject to the duties imposed by the [ELL]. This is so
> even though he might not have had actual control over the specific
> activity in which [the] plaintiff was engaged at the time of his
> injury.

*Wilson*, 252 Or. at 391, 448 P.2d 562 (citing *Thomas v. Foglio*, 225 Or. 540, 549, 358 P.2d 1066 (1961)). "In short, the common enterprise category applies in circumstances where both employees of the defendant and employees of the direct employer of the plaintiff have intermingled duties and responsibilities in performing the risk-creating activity or where equipment that the defendant controls is used in performing that activity." *Yeatts*, 360 Or.at *6.

According to the contract with BLM, Boise Cascade was responsible for developing a written operations and logging plan "commensurate with the terms and conditions of the contract which shall include measures needed to assure protection of the environment and watershed." BLM/Boise Contract L-24. The contract specified that "all logging shall be done in accordance with the plan developed by this provision." While it appears that no official plan was ever developed, it is clear that the contract gave Boise Cascade the authority to create such a plan. BLM representative Craig Brown testified that Boise Cascade was responsible for creating a safety plan for the Pilot Joe Sale, but did not ever complete one.

Additionally, under the terms of the Contract, Boise Cascade agreed to "be responsible for all damages to any persons or property that arise out of any operations under this contract and result from any breach of contract or wrongful or negligent act or omission of [Boise Cascade], its contractors, subcontractors, or employees of any of them." Special Provisions M-5. Boise Cascade entered into an independent contracting agreement with HM, Inc., and the contract included an almost identical indemnity provision. *See* Southern Oregon Contract ¶ 8. However, that contract also included an inspection provision: "[Boise Cascade] shall have the right from time to time to inspect [HM, Inc.'s] work to determine whether [HM, Inc.] is performing in a timely fashion and in accordance with the specifications of the Contract Area. [Boise Cascade] shall be the sole judge of compliance with specifications." Southern Oregon Contract ¶ 5. Thus,

while the BLM/Boise Cascade Contract gave sole authority to BLM to determine which trees could be cut and which must be reserved, the Boise Cascade/HM Inc. Contract also gave Boise the authority to inspect and judge compliance with the determined specifications.

Boise Cascade also designated the owner of HM, Inc., Ed Hanscom, and John Parks, Hanscom's foreman, to be Boise's representatives to BLM for logging operations. Hanscom held the initial safety meeting, distributed the sheet regarding timber feller safety and rules regarding reserve hardwoods and other leave trees.

Based on the contract provisions reserving the right of BLM and Boise Cascade to inspect and determine which trees must be cut and which must be reserved, and based on the intermingling of duties regarding safety and instructions to timber fellers over which trees must be cut and which must be reserved, the Plaintiffs have raised a question of fact as to whether or not Boise Cascade and HM, Inc. were engaged in a common enterprise with Robert McKenzie's employer to accomplish the cutting of the timber at the Pilot Joe sale.

### b. Defendants have shown that they met the standard imposed by the ELL.

Regardless of the common enterprise, the retained right of control, or the actual control, that the defendants maintained over the trees to be cut and the trees to be reserved on the Pilot Joe Sale, it is undisputed in the record that the Plaintiff knew of the danger of cutting trees located near reserve trees, particularly hardwoods, and that Plaintiff had the discretion to either cut the reserve hardwood or leave the harvest tree uncut. Plaintiff had nearly thirty years' experience in the field, and he testified that, on the Pilot Joe Sale alone, he made many decisions to cut or not cut a harvest tree based on its proximity to a reserve tree. While he could not recall whether or not he was told that he could cut a reserve tree for safety purposes,[3] he has offered no

---

[3] Plaintiff Robert McKenzie testified in his deposition that he could not recall if this information was provided to him. Later, in response to the motions for summary judgment, he submitted a declaration,

evidence to dispute the fact that, at the very least, he could leave a harvest tree uncut if he felt he could not bring it down safely. In fact he testified that there were times on the Pilot Joe project where "based on your experience, you just knew you weren't gonna get that tree out of there, and we would leave those behind." McKenzie Depo. 74:9-11.

Additionally, the overwhelming evidence in the record shows that all the other tree cutters knew that the discretion to cut a reserve tree or to leave a harvest tree uncut was left to the cutter himself. While the written contracts did not explicitly authorize the timber cutters themselves to make this decision, the evidence in the record shows that it is the way the Pilot Joe timber sale operated. The practical reason for this is evident: no one else could determine whether or not the tree could come down safely, based on the immediate circumstances and surrounding area, the direction in which the cutter planned to fell the tree, and the cutter's own experience and ability to do so. If the BLM or another supervisor or employer could come in and tell the tree feller which tree to cut, and how, the project would become infinitely more dangerous: the tree feller would constantly be second-guessed, forced to leave behind trees that he knows he is capable of cutting, or forced to cut trees he knows are outside of his abilities to do so. Such "oversight" would not provide more security and safety to the tree fellers, but less.

In this case, it was Robert McKenzie's job, and his alone, to make the decision to cut the reserve tree or to leave the harvest tree standing. No employer, direct or indirect, could have told him whether or not he, with his specific knowledge and expertise and experience, could cut that

_____

which stated affirmatively that he "was never told verbally, nor was I ever given any documents that stated that I could cut these types of trees (reserve, oak and madrone) for safety or for any other reason." (Dkt. #64). The Ninth Circuit has held that a non-moving party cannot defeat summary judgment by submitting a declaration that contradicts his own deposition testimony, even when that testimony consists of the party's inability to recall a key piece of information. *See Yeager v. Bowlin*, 693 F.3d 947, (9th Cir. 2009).

tree safely. Plaintiff himself stated that it was not an unusual situation, and he believed he could get it down safely.

Even imposing the high standards of the ELL, the Court can find no negligence on the part of the defendants. There was no defect or failure of equipment, no warning or additional training that should have been given but was lacking, no additional equipment or emergency procedure[4] that would have assisted the Plaintiff in his moment of need, when the tree did not fall as he anticipated. What happened was a sad and tragic accident, but the defendants in this case cannot be held liable for such. They are entitled to summary judgment on this claim.

## II.    Defendants are entitled to summary judgment on Plaintiffs' negligence and loss of consortium claims.

The Oregon Supreme Court has held that "a person's liability in negligence for work involving a risk or danger is generally no more extensive than his or her liability for that work under the ELL." *Boothby v. D.R. Johnson Lumber Co.*, 341 Or. 35, 46–47, 137 P.3d 699, 705 (2006) (citing *Howard v. Foster & Kleiser Co.*, 217 Or. 516, 533, 332 P.2d 621 (1958), on reh'g, 217 Or. 516, 342 P.2d 780 (1959) (holding that, "[i]f recovery cannot be had in this case under the Employer's Liability Law, it follows that none is available under the common-law rule of due care")). The Court has determined above that the defendants are entitled to summary judgment

---

[4] Plaintiffs' Response Brief raises the issue of "danger trees." There is no evidence in this case that the madrone hardwood that caused Robert McKenzie's injury was a "danger tree" as contemplated by the federal guidelines or the parties' contracts. The fact that the tree turned out to pose a danger to Robert McKenzie does not mean that it was a "danger tree." The BLM's Field Guide for Danger Tree Identification and Response introduces the idea of "danger trees" this way:

> Tree stability is determined by its location and the presence of defects, insects, disease, work activities, and weather conditions. If a tree is unstable, it may fail either partially or totally. If a tree fails, it is a danger to anyone who may be struck by it.

In this case, the madrone tree at issue did not "fail" from instability due to defects or disease. It was a strong, healthy hardwood tree that withstood the impact of the falling harvest tree. Plaintiffs' argument that it was a "danger tree" that should have been removed by someone other than the tree feller on the job is completely counter-intuitive and irrelevant to the facts of this case.

under the ELL; therefore they are similarly entitled to summary judgment under the common law
standard of negligence.

Plaintiff Pattie McKenzie's loss of consortium claim is dependent on the success of at
least one of Plaintiff Robert McKenzie's direct claims. Because none of them succeed, the loss
of consortium claim fails as well.

## **ORDER**

For the forgoing reasons, the defendants' motions (#47, 49, 51) are GRANTED.

It is so ORDERED and DATED this ___/ 7__ day of October, 2016.

MARK D. CLARKE
United States Magistrate Judge